## NEWMAN v. FIRST NAT. BANK OF EAST RUTHERFORD et al.

## WESTBROOK v. NEWMAN.
### Nos. 5525, 5596.

Circuit Court of Appeals, Third Circuit.
Feb. 27, 1935.

McDermott, Enright & Carpenter, of Jersey City, N. J. (Samuel M. Coombs Jr., of Jersey City, N. J., and Lionel P. Kristeller, of Newark, N. J., of counsel), for Newman.

William T. Ard, of Jersey City, N. J. (John W. Ockford, of Union City, N. J., of counsel), for Westbrook.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

The bill of complaint is a creditor's bill. It was filed in the District Court for the District of New Jersey by the Union Indemnity Company, hereinafter called the Indemnity Company, against John J. Holden and Bessie A. Holden, his wife, hereinafter called the Holdens, also against John J. Holden, Jr., their son, and against the First National Bank of East Rutherford, hereinafter called the Bank. It asked the court to declare void a judgment alleged to have been fraudulently entered against the Holdens by the Bank and to set aside a conveyance of lands by the sheriff to the Bank after execution on the judgment and sale thereunder.

The basis of the alleged void judgment and conveyance was a conspiracy entered into by the Holdens and the Bank fraudulently to prevent the Indemnity Company obtaining judgment against the Holdens until after the Bank had obtained judgment against them and had by execution recovered the debt from the properties of Bessie A. Holden.

At the cost of brevity, the story of the case will be told in two parts: One of undisputed facts, the other of facts disputed.

348

The decision will turn on how the facts of óne part fit into the facts of the other.

The first part of the story is as follows:

In December, 1930, and January, 1931, the Indemnity Company became surety for John J. Holden, Inc., on bonds ensuring its performance of two construction contracts in the aggregate sum of $75,772.75 after John J. Holden and Bessie A. Holden, his wife, had executed an indemnity bond in its favor.

In the spring of 1931, John J. Holden, Inc., defaulted on its construction contracts. The Indemnity Company completed the work at a cost of $13,000 and, after threatening suit for a month or two, instituted an action in the District Court on or about June 8, 1931, against the Holdens on their bond of indemnity. The Holdens, by elaborate pleadings, protracted the suit for a long time.

The Bank knew of the bond transaction in respect to the construction contracts and also knew that Bessie A. Holden owned considerable real estate and was the only obligor on the indemnity bond with financial responsibility, but disclaimed knowledge of the breach of the construction contracts before July, 1931.

On June 1, 1931, the Holdens owed the Bank $3,000 on several notes, one about due and the others overdue. The Bank, always speaking through its cashier who later became its conservator and still later its receiver, suggested to John J. Holden, hereinafter called Holden, that he and his wife increase their borrowings by $4,000, and make a new note for $7,000, "tying up" the $4,000 therein. Holden, accepting the suggestion in substance, made a counter proposition that, as he had "too many judgments against" him, the additional sum should be put in his son's name and that the new note and its renewals should run for only óne month instead of for two months as theretofore.

The tying up transaction was effected in this way: The Holdens made a new note to the Bank dated June 1, 1931, endorsed by the son, for $7,000, representing the $3,000 debt they already owed and the new $4,000 debt. But the $4,000 thus loaned and·on which interest was charged never was paid or credited to the Holdens. It was in fact placed in a separate savings account in the name of John J. Holden, Jr., the son, with the savings account book retained by the Bank so that nobody· but the Bank could reach it.

On July 1, 1931, the Holdens defaulted on the $7,000 note. Then, with the consent of the Bank, $500 was withdrawn from the savings account and applied in part payment of the principal of the $7,000 note and a new note was similarly drawn for $6,500. When it came due on August 3, the Holdens defaulted. The Bank then sued them on the note and, in the absence of a defense, promptly obtained judgment for the full amount of $6,500, giving no credit for the moneys it was still holding. The Bank then issued execution and levied upon the properties of Bessie A. Holden, previously appraised for the information of the Bank at $75,000 subject to two mortgages with unpaid balances aggregating $17,000, showing an equity of $58,000. At the sale the Bank bid in the properties for $1,500 and received from the sheriff a deed therefor. Holden remained in charge of the principal property, a commercial swimming pool, operated it in season, made repairs in part out of his own money, and turned over the daily income to the Bank. He was consulted by the Bank on the one occasion of a possible sale of the swimming pool for $50,000. When he objected, because the proposed installment payments were insufficient in amount, the Bank discontinued negotiations.

Time went on until, the swimming pool business being bad, the Bank removed Holden and put another man in his place. Thereupon Holden, in anger, went to the Indemnity Company and disclosed the situation involving what is said to be the fraud in the transaction and permitted that company, unhindered, to proceed with its suit to judgment in the sum of $13,000 and to execution and levy by the marshal upon the same properties. Then the Indemnity Company brought this suit to set aside the sheriff's conveyance to the Bank. There is no dispute about any of these facts.

The facts disputed, linked with the undisputed facts just stated, are these:

When the Indemnity Company was threatening suit against the Holdens on their bond of indemnity, Holden went to the Bank and informed it of the breach of the construction contracts and the impending suit of the Indemnity Company. He represented that he wanted to get his wife's properties in a place where, when the Indemnity Company obtained judgment against her, there would be nothing on

which it could levy, or, as he stated, "the judgment won't be any good." His wish, as then expressed, was to get his wife's properties in the name of the Bank, have the Bank carry the properties until they could pay the $3,000 debt and then have the Bank convey them to some corporation to be formed or nominated by him. To that end the Bank, knowing the shaky condition of the Holdens, instead of suing them at once, agreed that their notes should be renewed, month by month, and that, after waiting a month or two for appearance sake, they should finally be protested and then the Bank should sue the Holdens, obtain judgment against them for default of a defense, issue execution, have sale of the properties at which the Bank would bid and buy them in. Feeling that if the judgment were only for the small amount of the debt the Bank might encounter outside bidders at the sheriff's sale, it was agreed that the debt should be raised from the real figure of $3,000 to the more formidable figure of $7,000 by an additional loan of $4,000, within which in all probability the Bank could successfully bid at the sale (which was to be postponed if anybody should bid higher), but the loan should, because of judgments against Holden, be made on the son's endorsement and be "frozen" by placing it in a savings account in his name with the bank book retained by the Bank so that no one but the Bank could get the money. Accordingly, on June 1, 1931, the Holdens gave the Bank their note for $7,000 (the limit the Bank could loan) and the Bank set up the $4,000 savings account in their son's name, retaining the bank book. The Bank described the transaction as "a loan, but no money was passed." When, on July 1, it matured, $500 was, with the Bank's consent, withdrawn from the savings account, applied as a credit and a new note for $6,500 made. When, on August 3, that note came due it was protested. Whereupon the Bank brought suit against the Holdens for the full amount of the note, giving no credit for the $3,500 it held in the savings account under its control. For some reason it did not sue the son. The suit, in default of answer by the Holdens, promptly went to judgment for $6,596.95 on which execution was issued, levy made on the lands in question, sale had and the properties knocked down to the Bank, the only bidder, for $1,500. Then, on receiving the sheriff's deed, the Bank had an unexhausted judgment for $5,096.95 against the Holdens, $3,500 of money ostensibly loaned the Holdens locked up in the savings account subject to withdrawal by itself alone, and all of Bessie A. Holden's land with an appraised clear value of $58,000.

Thus, with everything in its hands, the Bank agreed orally, yet with evident hesitation, that when the Holdens paid what was actually due on their loan and paid in addition $1,000 as a bonus for its trouble, it would convey the properties to Holden's nominee, which of course would effectively prevent recovery by the Indemnity Company.

Holden paid a part of the expenses of the Bank's suit and thereafter a part of the expenses of the upkeep of the swimming pool. He operated the pool for a considerable time, not successfully. During that period the Bank received the income from the pool, paid taxes, insurance premiums, dues on building and loan shares (in reduction of the mortgages) and certain expenses. It conferred with Holden and deferred to his judgment in the matter of selling the swimming pool property. Finally, in May, 1933, it dismissed him and, by installing a new man, took over complete charge of the properties. Then Holden disclosed the situation to the Indemnity Company and this suit followed.

The Bank's defense was a general denial of any conspiracy with the Holdens, asserting that all it had done was lawfully to protect its loan by protest, judgment, execution and sale, giving, however, an explanation of the debtors' obligation, swollen by $4,000 and held in another account within the Bank's control. This was to the effect that Holden's account with the Bank had grown so small that it had ceased to be profitable; that to continue the $3,000 loan and make his business worthwhile the Bank suggested a $4,000 loan "in escrow" not to be credited or paid to or used by the Holdens but to be withheld from their reach (and therefore available for loan to somebody else) on which, however, they should pay interest in addition to interest on their $3,000 indebtedness, (something more than 11 per cent. on the original loan), maintaining that such an arrangement was merely a business transaction involving payment of more interest for services rendered; that it was in no way fraudulent nor was it even irregular for it was in truth ordinary banking commonly practiced by banks in New Jersey.

The learned trial court, not specifically finding fraud but refusing to accept the

Bank's version of the Holden transactions, entered a decree in which it directed the receiver of the Bank to note a credit of $3,500, the balance of the $4,000 frozen loan after withdrawal of $500, on the Bank's judgment against the Holdens for $6,596.95 and referred the case to a master to ascertain moneys paid by the Bank for taxes, interest, dues, premiums, etc.; then to sell the properties previously conveyed by the sheriff to the Bank and distribute the proceeds of the sale first to costs and expenses of this suit; next to the receiver of the Bank for its original loan of $3,000 to the Holdens and for such moneys as it, its conservator and receiver, had expended "in payment of mortgages, interest, dues, or other governmental claims against said property, insurance premiums, taxes and repairs"; and to distribute the remainder of the proceeds to the receiver of the Indemnity Company on its judgment against the Holdens for $13,028.20 and interest; any balance to be paid to the Clerk subject to the further order of the court.

Both the Indemnity Company and the Bank appealed; the Indemnity Company because, as it claims, the decree was inadequate in that it gave the Bank a preference in the distribution of proceeds of the sale and reimbursed it for its outlay in a fraudulent transaction; the Bank because, as it claims, the plaintiff failed to make out a case of fraud and was not entitled to have the judgment and sale set aside in whole or in part.

▇▇▇ The Bank, on the admitted facts, furnished a perfect framework for Holden's story. Its act of increasing the Holden loan yet holding onto the money and charging interest on it, described as common banking practice in New Jersey (which we are loath to believe), was so far removed from honest banking that it inescapably took on the character of fraud. Moreover, the banking transaction and later the conduct of the Bank in respect to the sale, purchase and management of the properties fit in exactly with Holden's acts. His acts also fit in with those of the Bank. Taken together they effectively prevented the Indemnity Company obtaining an early judgment and recovery against the properties of Bessie A. Holden. For a time this was to the advantage of the Holdens but, seemingly, the Bank changed its mind and thereafter the advantage ran to the Bank. Whether the Bank played unfairly with the Holdens is not a matter of present concern except as it uncovered and revealed the relation of the parties at the beginning. That relation, we find on facts admitted and established, was one of plain fraud into which the parties entered perhaps for different reasons yet with the central purpose of preventing the Indemnity Company obtaining judgment against the Holdens until after the Bank had obtained judgment, issued execution and acquired their properties. That the fraudulent scheme was carried out through forms of legal process affects its illegal aspect not at all. First National Bank of Cincinnati v. Flershem, 290 U. S. 504, 54 S. Ct. 298, 78 L. Ed. 465, 90 A. L. R. 391; Bulova Watch Co. v. Zucker, 113 N. J. Eq. 431, 167 A. 515; Mechanics' National Bank v. H. C. Burnet Mfg. Co., 33 N. J. Eq. 486; Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. 355, 85 A. L. R. 128.

We recognize as settled law that where a grantee practices fraud upon the grantor and the deed is set aside, no allowance will be made to him for expenses incurred or improvements made upon the property. We also recognize variations of this rule, on facts different from those in this case, where the fraudulent conveyance is effected through proceedings involving rights of creditors adversely affected. Kaplan v. Heiles, 107 N. J. Eq. 443, 152 A. 855; Milwaukee & Minnesota R. R. Co. v. Soutter, 13 Wall. 517, 20 L. Ed. 543; Burt v. C. Gotzian & Co. (C. C. A.) 102 F. 937. But here the fraud was not upon the grantor but was practiced by the (potential) grantor and grantee upon a creditor. If we extract from the fraudulent actors every advantage which they derived from their fraud and restore the creditor to the position which lawfully belonged to it at the time the fraud was perpetrated and give it all the rights which, but for the fraud, it had under the law, we feel that equity would adequately be done.

▇▇▇ And this we think can here be accomplished with reasonable legal precision except for the lapse of time and its natural consequences, factors entering inevitably into any decree. The first thing we shall do is to take from the Bank the preference in the distribution of proceeds of sale which the trial court awarded it on its original claim of $3,000 against the Holdens. We find the Bank's judgment wholly void. Therefore the whole of it should be set aside. Setting aside only the more vicious part (the $3,500 sham loan) is not enough. It was the act of the Bank in obtaining the

judgment by fraud not the amount of the judgment that defeated the Indemnity Company recovering on its judgment.

In regard to the preference which the trial court gave the Bank as to expenditures normally incident to ownership of property, we are constrained, against the trend of the law on facts of other cases, to hold that under the facts of this case the Bank should, in the distribution of proceeds of the sale, be reimbursed for its proper disbursements, that is, for disbursements which the Indemnity Company itself would have been required to make had it, without hindrance by the Bank, seasonably obtained judgment and acquired the properties by execution. In this regard however it should be observed, so that the master may properly compute reimbursements to the receiver of the Bank for its proper expenditures, that the Bank unlawfully withheld the swimming pool from the Indemnity Company and, at its own risk, embarked unlawfully in the business of operating it for profit. Therefore any profits that the Bank may have made in operating the pool should be deducted from expenditures for which otherwise it would be entitled to reimbursement, for expenditures from profits are expenditures of money earned by the swimming pool, which but for the Bank's fraud would have belonged to the Indemnity Company, not expenditures by the Bank from its own funds. If, on the other hand, instead of earning profits the Bank sustained losses, they must be borne by the Bank alone.

Profits and losses from the swimming pool should be reckoned by the master on an annual basis, and be so treated in estimating reimbursements. Profits from the pool to be found by the master, if any, should be operating profits, that is, profits resulting from the operation of the pool before operating receipts, if any, were applied to charges or expenditures, such as taxes, interest, principal of mortgage, etc., for which the Bank will be allowed reimbursement.

Our views on the several aspects of this case can be gathered from the particulars in respect to which we shall direct the learned trial court to modify its decree. They are as follows:

That the judgment of the First National Bank of East Rutherford against John J. Holden and Bessie A. Holden and the proceedings thereunder be declared void; that the part of the second paragraph of the decree following the order that the lands shall "be sold by the said Special Master" be made to read: "And all the right, title and estate of John J. Holden and Bessie A. Holden therein, subject however to mortgage liens, judgment liens, and other liens against the lands of the said Bessie A. Holden, if any, which are prior to the lien of the judgment of the First National Bank of East Rutherford against John J. Holden and Bessie A. Holden, and that the proceeds of the sale be distributed and payments made as follows:

"1. Costs of this suit including allowance to the master.

"2. Taxes due and unpaid.

"3. To the receiver of the First National Bank of East Rutherford:

"(a) Reimbursement for taxes, insurance premiums and governmental claims paid;

"(b) Reimbursement for money expended for repairs since the conveyance of the land to the said Bank which were necessary to maintain the properties, but not for improvements;

"(c) Reimbursement for interest, building and loan dues, or other claims paid on account of the mortgages;

"(d) Reimbursement for principal otherwise paid on account of the mortgages;

"(e) Reimbursement to the receiver of the said Bank for above named expenditures by the said Bank, its conservator and its receiver shall be made only after deducting from such expenditures any operating profits earned by them in running the swimming pool, as defined in the opinion, and shall in no case include reimbursement for operating losses.

"4. To the receiver of the Union Indemnity Company, debt, interest and cost of its judgment against John J. Holden and Bessie A. Holden.

"5. To the receiver of the said Bank $3,000 with interest on its original loan to John J. Holden and Bessie A. Holden.

"6. Any balance to the Clerk of the District Court to be distributed under the further order of that court."

When so modified the decree below will in all respects be affirmed; costs of appeal and cross-appeal to be taxed against the receiver of the First National Bank of East Rutherford.