In the Matter of **ALLIED DEVELOP-MENT CORPORATION, Bankrupt.**

**Donald S. EISENBERG, American Exchange Bank and Commercial State Bank, Respondents-Appellants,**

v.

**Milo G. FLATEN, Petitioner-Appellee.**

**No. 18174.**

United States Court of Appeals, Seventh Circuit.

Dec. 10, 1970.

Louis W. Levit, Chicago, Ill., for respondents-appellants; Harry S. Miller, Chicago, Ill., of counsel.

George G. Blake, Hugh H. Bell, Madison, Wis., for petitioner-appellee; Aberg, Bell, Blake & Metzner, Madison, Wis., of counsel.

Before CASTLE, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

CASTLE, Senior Circuit Judge.

Respondents-appellants, Donald S. Eisenberg, American Exchange Bank, and Commercial State Bank, prosecute this appeal from the judgment order of the District Court denying their petitions for review of an order of the referee in bankruptcy finding liens asserted by the appellants to be null and void. The liens are based on a second mortgage on a lumber-yard property,[1] an asset of the bankrupt, Allied Development Corporation.

Allied was engaged in the business of development, sale and management of real estate. Its assets included real estate encumbered by mortgages held by a close affiliate engaged in the insurance business.[2] Some of the corporate officers of each of the corporations were corporate officers of the other. Prior to the date of the second mortgage here in question, August 27, 1964, the Insurance Department of the State of Wisconsin directed that these mortgages be repaid immediately. Allied sought financial assistance from respondent-appellant Donald S. Eisenberg, a partner in the law firm which represented Allied, to accomplish the repayments to the insurance company. Eisenberg made a loan of $90,000.00 to Allied. He received as security the August 27, 1964 junior mortgage on the lumber-yard owned by Allied. He did not record the mortgage until September 22, 1964, some three weeks later. On January 19, 1965 Allied filed a petition for relief under Chapter XI of the Bankruptcy Act (15 U.S.C.A. § 701 et seq.). On June 3, 1965, Eisenberg assigned the mortgage to the American Exchange Bank and the Commercial State Bank, respondents-appellants, as additional security for repayment of pre-existing loans made to him aggregating $57,340.00 plus interest. The Chapter XI arrangement proceeding failed, and on July 21, 1966 Allied was adjudicated a bankrupt. The trustee in bankruptcy filed a petition asserting the invalidity of the August 27, 1964 second mortgage and requesting that the parties be ordered to show cause why the fund remaining from the sale of the property ($68,055.44) should not be declared free of any lien of said mortgage and be deposited with the general funds of the bankrupt's estate.

Among other grounds, the trustee's petition alleged invalidity of the mortgage under § 67(d) (2) (d) of the Bankruptcy Act (11 U.S.C.A. § 107(d) (2) (d)).[3] Following a hearing on the

1. By stipulation of the parties, the encumbered property was sold by the trustee in bankruptcy free and clear of liens, but with the liens to attach to the proceeds of the sale. After satisfaction of a first mortgage lien from the proceeds of the sale there remained $68,055.44 which was deposited with the court to await a determination of the validity of the second mortgage, under which appellants make their claims to a lien.

2. The loans from the insurance company were not made directly to Allied. Apparently to avoid a provision of the Wisconsin statutes (§ 201.24), which prohibits a domestic insurance company from making a loan to an affiliate, the loans were made through a "nominee". Allied would convey title to its property to the "nominee", in some cases respondent-appellant Eisenberg, who would apply to the insurance company for the loan and give a mortgage as security. The "nominee" would then turn over the proceeds of the loan and reconvey the property to Allied.

3. § 67(d) (2) (d) provides: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is

petition, the referee filed an opinion containing his findings of fact and conclusions of law. He concluded that as to both Eisenberg and the two banks the mortgage and the assignment thereof were made with actual intent to hinder, delay or defraud creditors. On review the District Court in affirming the order entered by the referee pointed to an alternative basis for concluding that the mortgage was invalid as to the banks, i. e., that the banks were not bona fide lienors and, therefore, were not entitled to the protection afforded by the concluding proviso of § 67(d) (6).[4]

The record discloses that when Eisenberg made the loan of $90,000.00 to Allied it was agreed that the second mortgage he took as security would not be recorded. Eisenberg, in his testimony characterized the date of the mortgage, August 27, 1964, as that "fateful day" when the Wisconsin authorities were ready "to lower the boom" on Madison American Guaranty Insurance Co., Allied's affiliate, which had been directed to secure repayment of the loans for which Allied's property stood as security. Eisenberg further testified that on that date "there were several judgments that were intercepted at the courthouse steps and people talked out of filing them"; that "we didn't want any mortgages, liens or judgments or anything else to be of record to in any way taint the credit of Allied"; that "Allied was in a cash liquid bad position and I did not record it [the second mortgage] because * * * I didn't want the Chamber of Commerce report to pick up the fact that Allied had granted a mort-

gage for $90,000.00 and I felt no problem at all in not recording it."

The record further discloses that Allied and its related corporations, Madison American Guaranty Insurance Company and Brooks and Woodington, Inc., were then engaging in a check-kiting practice, and Friday, September 18, 1964 the Wisconsin Banking Commission informed the appellant banks, in which Allied and Brooks and Woodington, Inc. had their accounts, that on the following Monday they would be permitted to credit those accounts only with deposited sums which represented cash or its equivalent. This augmented the crisis Allied was experiencing with respect to cash liquidity and over the week-end it sold some two and one-half to three million dollars worth of its properties. On September 22, 1964 Eisenberg recorded the mortgage he had been withholding from record because "at that point the situation did not look too good".

The appellants predicate the existence of error requiring reversal as to all of them on a contention that the record fails to support the finding and conclusion that the agreement to withhold the mortgage from record, and the failure to record it for three weeks, was with actual intent to hinder, delay or defraud creditors of Allied. We disagree as to the asserted insufficiency of the evidence in this respect. Eisenberg's testimony concerning the reason for not recording the mortgage is in our opinion most convincing that such action was precisely directed to the very purpose of hindering or delaying existing creditors

fraudulent * * * (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors."

4. § 67(d) (6) provides: "A transfer made or an obligation incurred by a debtor adjudged bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be

null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: * * * *And provided further,* That such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair, as defined in this subdivision, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment."

and misleading future creditors. His testimony was to the effect that at the very time the mortgage was given, but its existence being withheld from public knowledge, Allied's existing creditors were being persuaded not to take judgments against Allied. And, it is reasonable to infer that Allied's purpose in keeping mention of the mortgage out of the Chamber of Commerce report had its impact on future creditors. Allied and Eisenberg were anxious that nothing of record "in any way taint the credit of Allied", and there is evidence that Allied obtained at least several thousands of dollars in new credit during the period the $90,000.00 mortgage, due to failure to record it, was not reflected by sources normally relied upon for credit information.

Certainly, the finding and conclusion with respect to the existence of actual intent is not "clearly erroneous" insofar as it rests on factual considerations. Nor is it the product of the application of incorrect legal criteria. In this latter connection we find inapposite appellants' argument that failure to record a mortgage for a three week period does not, of itself, establish "actual intent" to hinder, delay or defraud creditors. Here the failure to record does not stand in isolation. It was not only deliberate —the product of agreement—but it was accompanied by admitted purpose which establishes the "actual" intent requisite to invalidate an obligation under § 67(d) (2) (d) of the Bankruptcy Act. Consequently, of no avail to appellants on this phase of their appeal is their reliance upon the express language of § 67(d) (2) (d) which makes "actual intent as distinguished from intent presumed in law" a prerequisite to the existence of fraud which invalidates an obligation. Likewise, the numerous authorities cited by appellants which give recognition to the difference between constructive fraud—circumstances where fraudulent intent is presumed as a matter of law—and intentional fraud do not serve to insulate the instant withholding of the mortgage from record from the application of § 67(d) (2) (d). The record in this case establishes actual intent. There is that concurrence of facts which leads to the irresistible conclusion that the withholding of the mortgage from record was calculated to mislead creditors. On the record before us it would tax credulity to say that in keeping the mortgage off the record Allied and Eisenberg had no purpose to hinder, delay or defraud creditors. On this phase of the appeal we conclude that the record amply supports the denial of Eisenberg's claim to a lien against the proceeds from the sale of the property.

The appellant banks advance a separate and independent contention upon which they predicate the existence of an additional error requiring reversal of the rejection of their claims to liens. In this respect the banks contend that even though the record is viewed as supporting the holding that Allied and Eisenberg actually intended to hinder, delay or defraud creditors by withholding the recording of the mortgage, and the lien of the mortgage is therefore void as against the trustee in bankruptcy insofar as a claim of lien on the part of Eisenberg is concerned, nevertheless, the record presents no basis in fact or law warranting a conclusion that the banks were guilty of actual fraudulent intent in taking the assignment of the mortgage. Consequently, they urge they are entitled to assert the mortgage lien against the trustee under the provisions of § 67(d) (6) of the Bankruptcy Act to the extent of repayment of the $57,340.-00 plus interest which Eisenberg owes to them—the pre-existing loans with respect to which Eisenberg assigned the mortgage to the banks as additional security.

The referee made a factual finding, undisturbed by the District Court on review, that neither of the banks knew of the delay in the recording of the mortgage when some nine months after its execution the banks took the

assignment[5] from Eisenberg as additional collateral for his pre-existing loans. The record does disclose, however, that at the time of the assignment the banks knew Allied had initiated a Ch. XI arrangement proceeding; had filed claims therein; were aware of financial irregularities of Allied; and were aware of the check kiting and of the action taken by the Wisconsin Banking Commission with respect thereto. The record reflects that all of the negotiating for additional collateral between the banks and Eisenberg was done by William Hobbins, president of the American Exchange Bank, on behalf of both banks; that on May 18, 1965 Hobbins wrote Eisenberg that he was "not interested in any security based upon mortgages originating with Allied Development Corporation"; and Hobbins testified that his reason for making such statement was "I had my belly full of Allied Development Corporation and their other activities". In the face of this background the banks accepted the assignment on the mortgage without a title search, did not get an opinion on the title, and made no investigation of the facts or circumstances surrounding the issuance of the mortgage. An examination of title would have disclosed the delay in recording.

Actual fraudulent intent "requires a conscious realization by the lienor that the lien will work a fraud on the debtor's creditors". In re Peoria Braumeister Co., 7 Cir., 138 F.2d 520, 524. We agree with the banks that under the particular factual circumstances here involved the standard enunciated in *Braumeister* has not been met. But we agree with the District Court that the record convincingly establishes lack of good faith on the part of the banks in taking the assignment, and that, consequently, absence of *bona fide* status precludes them from invoking the concluding proviso of § 67(d) (6).

Despite their knowledge that Allied was already the subject of custody of the bankruptcy court in a Ch. XI proceeding; their familiarity with the previous irregular conduct of Allied with respect to financial transactions; and their previous express rejection of collateral in the form of any security originating with Allied, the banks accepted the assignment of the Allied mortgage given to Eisenberg without bothering to make any inquiry into the circumstances of its issuance. In this connection Hobbins testified the banks took the assignment because "it was the best and only thing we could get". While the banks' lack of knowledge of or participation in the withholding of the mortgage from record relieves the banks of actual intent to hinder, delay or defraud Allied's creditors by such failure to record the mortgage, nevertheless, the circumstances surrounding the banks' acceptance of the assignment demonstrates lack of good faith on the part of the banks.

And, we are not persuaded by the banks' argument that good faith on the part of the purchaser or lienor is not a prerequisite to the application of the concluding proviso of § 67(d) (6)—that the absence of actual fraudulent intent suffices to protect them. The proviso refers to " * * * such purchaser, lienor, or obligee" and the antecedent of "such" is "a bona fide purchaser, lienor, or obligee". See note 4, *supra.*

Nor, in view of the context in which it appears, do we regard the comment in *Braumeister* (138 F.2d at 524) to the effect that a grantee who is "guilty of constructive fraud is entitled to protection to the extent of the consideration he paid" as dictating a construction of the proviso which dispenses with the requirement of good faith. *Braumeister* involved a situation where a lender took a note from the bankrupt in the amount of $3,000 but only advanced $2,500 cash. Good faith of the lender was found. In reaching the conclusion that the lender was entitled to the protection of the mortgage lien to the extent of the

---

5. The assignment to the banks was not accompanied by delivery of the mortgage or the note secured thereby.

amount actually advanced, this Court said (138 F.2d at 523):

> "We arrive at this conclusion by virtue of Section 67 sub. d(6) of the Bankruptcy Act * * * which provides that a bona fide lienor who, without actual fraudulent intent, has given a consideration less than fair for such lien, may retain the lien as security for repayment."

The comment later in the opinion (p. 524) with respect to protection afforded to a grantee or lienor "guilty of constructive fraud" is but a recognition that constructive fraud, i. e., fraudulent intent presumed in law, is not necessarily inconsistent with the existence of good faith on the part of the grantee or lienor.[6] It is not a holding that good faith is not a prerequisite to the application of the proviso.

We conclude that the lack of good faith on the part of the banks precludes the banks from successfully invoking the protection accorded a bona fide lienor under the concluding proviso of § 67(d) (6).

The judgment order appealed from is affirmed.

Affirmed.

6. Cf. Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, 397.