803 F.2d 1288
 2 UCC Rep.Serv.2d 1140
 UNITED STATES of America
v.
TABOR COURT REALTY CORP., McClellan Realty Co., Inc.,
Pagnotti Enterprises, Inc., Loree Associates, James J.
Tedesco, Henry Ventre, Louis Pagnotti, II, Raymond Colliery
Co., Inc., Blue Coal Company, Gillen Coal Mining Co.,
Carbondale Coal Co., Moffat Premium Anthracite, Northwest
Mining, Inc., Maple City Coal Co., Powderly Corporation,
Clinton Fuel Sales, Inc., Great American Coal Co., Joseph
Solfanelli, individually and as trustee, General Electric
Credit Corp., Commonwealth of Pa. Dept. of Mines & Mineral
Industries, Dept. of Environmental Resources and Dept. of
Revenue, Borough of Olyphant, John J. Gillen, Thomas J.
Gillen, Robert W. Cleveland & Sons, Inc., William T.
Kirchoff, Jay W. Cleveland, Royal E. Cleveland, City of
Scranton Sewer Authority, Lackawanna River Basin Authority,
Borough of Taylor, Lackawanna County, William R. Henkleman,
Gleneagles Investment Co., Inc., Jeddo Highland Coal Co.,
Olyphant Premium Anthracite, Inc., Olyphant Associates,
Minindu Corporation, Glen Nan, Inc., Gilco, Inc., Jay W.
Cleveland, As Administrator of the Estate of Royal E.
Cleveland (Six Cases).
Appeal of McCLELLAN REALTY COMPANY, Jeddo Highland Coal Co.,
Pagnotti Enterprises, Inc., Loree Associates, Gillen Coal
Mining Co., Carbondale Coal Co., Moffat Premium Anthracite,
Northwest Mining, Inc., Maple City Coal Co., Powderly
Corporation, Clinton Fuel Sales, Inc., Olyphant Premium
Anthracite, Inc., Olyphant Associates, Minindu Corporation,
Gilco, Inc. and Joseph Solfanelli, individually and as
trustee, in No. 85-5636.
Appeal of James J. HAGGERTY, Trustee in Bankruptcy for Blue
Coal Corporation and Glen Nan, Inc. in Nos.
85-5637 and 85-5781. (Two Cases)
Appeal of The UNITED STATES in Nos. 85-5649 and 85-5780. (Two Cases)
Appeal of McCLELLAN REALTY CORPORATION and other Defendants
 in No. 85-5751.
 Nos. 85-5636, 85-5637, 85-5649, 85-5751, 85-5780 and 85-5781.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 10, 1986.
Decided Oct. 22, 1986.
As Amended Oct. 22, 1986.
Rehearing and Rehearing En Banc Denied Nov. 24, 1986.
 
 Roger M. Olsen, Asst. Atty. Gen., Michael L. Paul, William S. Estabrook, Lisa A. Prager (argued), Tax Div., Dept. of Justice, Washington, D.C., for United States; James J. West, U.S. Atty., of counsel.
 Robert J. Rosenberg (argued), Latham & Watkins, Bernard Ouziel, New York City, Joseph R. Solfanelli, Gerald J. Butler, Solfanelli & Butler, Scranton, Pa., for McClellan Realty Co., Inc. et al.
 Doran, Nowalis & Flanagan, Robert C. Nowalis (argued), Wilkes-Barre, Pa., for James J. Haggerty, Trustee in Bankruptcy for Blue Coal Corp. and Glen Nan, Inc.
 A. Bruce Schimberg, Frank R. Kennedy, Michael J. Sweeney, Richard B. Kapnick, Sidley & Austin, Chicago, Ill., for Nat. Commercial Finance Ass'n, Inc.
 Before ALDISERT, Chief Judge, and HIGGINBOTHAM and HUNTER, Circuit Judge.
 OPINION OF THE COURT
 ALDISERT, Chief Judge.
 
 
 1
 We have consolidated appeals from litigation involving one of America's largest anthracite coal producers that emanate from a district court bench trial that extended over 120 days and recorded close to 20,000 pages of transcript. Ultimately, we have to decide whether the court erred in entering judgment in favor of the United States in reducing to judgment certain federal corporate tax assessments made against the coal producers, in determining the priority of the government liens, and in permitting foreclosure on the liens. To reach these questions, however, we must examine a very intricate leveraged buy-out and decide whether mortgages given in the transaction were fraudulent conveyances within the meaning of the constructive and intentional fraud sections of the Pennsylvania Uniform Fraudulent Conveyances Act (UFCA), 39 Pa.Stat. Secs. 354-357, and if so, whether a later assignment of the mortgages was void as against creditors.
 
 
 2
 The district court made 481 findings of facts and issued three separate published opinions: United States v. Gleneagles Investment Co., 565 F.Supp. 556 (M.D.Pa.1983) (Gleneagles I); 571 F.Supp. 935 (1983) (Gleneagles II); and 584 F.Supp. 671 (1984) (Gleneagles III). We are told that this case represents the first significant application of the UFCA to leveraged buy-out financing.
 
 
 3
 We will address seven issues presented by the appellants and an amicus curiae, the National Commercial Finance Association, and by the United States and a trustee in bankruptcy as cross appellants:
 
 
 4
 * whether the court erred in applying the UFCA to a leveraged buy-out;
 
 
 5
 * whether the court erred in denying the mortgage assignee, McClellan Realty, a "lien superior to all other creditors";
 
 
 6
 * whether the court erred in "collapsing" two separate loans for the leveraged buy-out into one transaction;
 
 
 7
 * whether the court erred in holding that the mortgages placed by the borrowers on November 26, 1973 were invalid under the UFCA;
 
 
 8
 * whether the court erred in holding that the mortgages placed by the guarantors were invalid for lack of fair consideration;
 
 
 9
 * in the government's cross-appeal, whether the court erred in determining that the mortgage assignee, McClellan Realty, was entitled to an equitable lien for municipal taxes paid; and
 
 
 10
 in the government's and trustee in bankruptcy's cross-appeal, whether the court erred in placing the mortgage assignee, McClellan Realty, on the creditor list rather than removing it entirely.
 
 
 11
 We will summarize a very complex factual situation and then discuss these issues seriatim.
 
 I.
 
 12
 These appeals arise from an action by the United States to reduce to judgment delinquent federal income taxes, interest, and penalties assessed and accrued against Raymond Colliery Co., Inc. and its subsidiaries (the Raymond Group) for the fiscal years of June 30, 1966 through June 30, 1973 and to reduce to judgment similarly assessed taxes owed by Great American Coal Co., Inc. and its subsidiaries for the fiscal year ending June 30, 1975.
 
 
 13
 The government sought to collect these tax claims from surface and coal lands owned by the Raymond Group as well as from lands formerly owned by it but which, as a result of allegedly illegal and fraudulent county tax sales, were later owned by Gleneagles Investment Co., Inc. In addition, the government sought to assert the priority of its liens over liens held by others. The district court held in favor of the government on most of its claims and concluded the litigation by promulgating an order of priority of liens on Raymond Group lands.
 
 
 14
 Raymond Colliery, incorporated in 1962, was owned by two families, the Gillens and the Clevelands. It owned over 30,000 acres of land in Lackawanna and Luzerne counties in Pennsylvania and was one of the largest anthracite coal producers in the country. In 1966, Glen Alden Corporation sold its subsidiary, Blue Coal Corporation, to Raymond for $6 million. Raymond paid $500,000 in cash and the remainder of the purchase price with a note secured by a mortgage on Blue Coal's land. Lurking in the background of the financial problems present here are two important components of the current industrial scene: first, the depressed economy attending anthracite mining in Lackawanna and Luzerne Counties, the heartland of this industry; and second, the Pennsylvania Department of Environmental Resources' 1967 order directing Blue Coal to reduce the amount of pollutants it discharged into public waterways in the course of its deep mining operations, necessitating a fundamental change from deep mining to strip or surface mining.
 
 
 15
 Very serious problems surfaced in 1971 when Raymond's chief stockholders--the Gillens and Clevelands--started to have disagreements over the poor performance of the coal producing companies. The stockholders decided to solve the problem by seeking a buyer for the group. On February 2, 1972, the shareholders granted James Durkin, Raymond's president, an option to purchase Raymond for $8.5 million. The stockholders later renewed Durkin's option at a reduced price of $7.2 million.
 
 
 16
 Durkin had trouble in raising the necessary financing to exercise his option. He sought help from the Central States Pension Fund of the International Brotherhood of Teamsters and also from the Mellon Bank of Pittsburgh. Mellon concluded that Blue Coal was a bad financial risk. Moreover, both Mellon and Central States held extensive discussions with Durkin's counsel concerning the legality of encumbering Raymond's assets for the purpose of obtaining the loan, a loan which was not to be used to repay creditors but rather to buy out Raymond's stockholders.
 
 
 17
 After other unsuccessful attempts to obtain financing for the purchase, Durkin incorporated a holding company, Great American, and assigned to it his option to purchase Raymond's stock. Although the litigation in the district court was far-reaching, most of the central issues have their genesis in 1973 when the Raymond Group was sold to Durkin in a leveraged buy-out through the vehicle of Great American.
 
 
 18
 A leveraged buy-out is not a legal term of art. It is a shorthand expression describing a business practice wherein a company is sold to a small number of investors, typically including members of the company's management, under financial arrangements in which there is a minimum amount of equity and a maximum amount of debt. The financing typically provides for a substantial return of investment capital by means of mortgages or high risk bonds, popularly known as "junk bonds." The predicate transaction here fits the popular notion of a leveraged buy-out. Shareholders of the Raymond Group sold the corporation to a small group of investors headed by Raymond's president; these investors borrowed substantially all of the purchase price at an extremely high rate of interest secured by mortgages on the assets of the selling company and its subsidiaries and those of additional entities that guaranteed repayment.
 
 
 19
 To effectuate the buy-out, Great American obtained a loan commitment from Institutional Investors Trust on July 24, 1973, in the amount of $8,530,000. The 1973 interrelationship among the many creditors of the Raymond Group, and the sale to Great American--a seemingly empty corporation which was able to perform the buy-out only on the strength of the massive loan from IIT--forms the backdrop for the relevancy of the Pennsylvania Uniform Fraudulent Conveyance Act, one of the critical legal questions presented for our decision.
 
 
 20
 Durkin obtained the financing through one of his two partners in Great American.[1] The loan from IIT was structured so as to divide the Raymond Group into borrowing companies and guarantor companies. The loan was secured by mortgages on the assets of the borrowing companies, but was also guaranteed by mortgages on the assets of the guarantor companies. We must decide whether the borrowers' mortgages were invalid under the UFCA and whether there was consideration for the guarantors' mortgages.
 
 
 21
 The IIT loan was closed on November 26, 1973. The borrowing companies in the Raymond Group received $7 million in direct proceeds from IIT. The remaining $1.53 million was placed in escrow as a reserve account for the payment of accruing interest. The loans were to be repaid by December 31, 1976, at an interest rate of five points over the prime rate but in no event less than 12.5 percent. In exchange, each of the borrowing companies--Raymond Colliery, Blue Coal, Glen Nan, and Olyphant Associates--created a first lien in favor of IIT on all of their tangible and intangible assets; each of the guarantor companies--all other companies in the Raymond Group--created a second lien in favor of IIT on all of their tangible and intangible assets. The loan agreement also contained a clause which provided IIT with a priority lien on the proceeds from Raymond's sales of its surplus lands. Finally, the agreement provided that violations of any of the loan covenants would permit IIT to accelerate the loan and to collect immediately the full balance due from any or all of the borrowers or guarantors.
 
 
 22
 The exchange of money and notes did not stop with IIT's advances to the borrowing companies. Upon receipt of the IIT loan proceeds, the borrowing companies immediately transferred a total of $4,085,000 to Great American. In return, Great American issued to each borrowing company an unsecured promissory note with the same interest terms as those of the IIT loan agreement. In addition to the proceeds of the IIT loan, Great American borrowed other funds to acquire the purchase price for Raymond's stock.
 
 
 23
 When the financial dust settled after the closing on November 26, 1973, this was the situation at Raymond: Great American paid $6.7 million to purchase Raymond's stock, the shareholders receiving $6.2 million in cash and a $500,000 note; at least $4.8 million of this amount was obtained by mortgaging Raymond's assets.
 
 
 24
 Notwithstanding the cozy accommodations for the selling stockholders, the financial environment of the Raymond Group at the time of the sale was somewhat precarious. At the time of the closing, Raymond had multi-million dollar liabilities for federal income taxes, trade accounts, pension fund contributions, strip mining and back-filling obligations, and municipal real estate taxes. The district court calculated that the Raymond Group's existing debts amounted to at least $20 million on November 26, 1983. 565 F.Supp. at 578.
 
 
 25
 Under Durkin's control after the buy-out, Raymond's condition further deteriorated. Following the closing the Raymond Group lacked the funds to pay its routine operating expenses, including those for materials, supplies, telephone, and other utilities. It was also unable to pay its delinquent and current real estate taxes. Within two months of the closing, the deep mining operations of Blue Coal were shut down; within six months of the closing, the Raymond Group ceased all strip mining operations. Consequently, the Raymond Group could not fulfill its existing coal contracts and became liable for damages for breach of contract. The plaintiffs in the breach of contract actions exercised their right of set-off against accounts they owed the Raymond Group. Within seven months of the closing, the Commonwealth of Pennsylvania and the Anthracite Health & Welfare Fund sued the Raymond Group for its failures to fulfill back-filling requirements in the strip mining operations and to pay contributions to the Health & Welfare Fund. This litigation resulted in injunctions against the Raymond Group companies which prevented them from moving or selling their equipment until their obligations were satisfied. Moreover, Lackawanna and Luzerne counties announced their intent to sell the Raymond Group properties for unpaid real estate taxes. Finally, on September 15, 1976, IIT notified the borrowing and guarantor Raymond companies that their mortgage notes were in default. On September 29, 1976, IIT confessed judgments against the borrowing companies for the balance due on the loan and began to solicit a buyer for the Raymond Group mortgages.
 
 
 26
 New dramatis personae came on stage and orchestrated additional financial dealings which led to the purchase of the IIT mortgages. These dealings form the backdrop for additional legal issues to be decided here. Pagnotti Enterprises, another large anthracite producer, was the prime candidate to purchase the mortgages from IIT. In December 1976, James J. Tedesco, on behalf of Pagnotti, commenced negotiations for the purchase. Tedesco signed an agreement on December 15, 1976. Pursuant to the mortgage sale contract--and prior to the closing of the sale and assignment of the mortgages--IIT and Pagnotti each placed $600,000 in an escrow account to be applied to the payment of delinquent real estate taxes on properties listed for the county tax sales or to be used as funds for bidding on the properties at the tax sales.
 
 
 27
 IIT and Pagnotti agreed that bidding on the properties at the Lackawanna and Luzerne county tax sales would be undertaken by nominee corporations. Pursuant to their agreement, more new business entities then entered the picture. Tabor Court Realty was formed to bid on Raymond's properties at the Lackawanna County tax sale; similarly, McClellan Realty was formed to bid on Blue Coal's lands in Luzerne County. Pagnotti prepaid the delinquent taxes that predated IIT's mortgages to Lackawanna County. On December 17, 1976, Tabor Court Realty obtained Raymond's Lackawanna lands for a bid of $385,000; yet by this date an involuntary petition in bankruptcy had been filed against Blue Coal, a chief Raymond subsidiary, by its creditors. A similar proceeding was instituted against another subsidiary, Glen Nan. Based on the failure of Tabor Court to pay other delinquent taxes, on December 16, 1980, Lackawanna County held a second tax sale of Raymond's lands. At that sale, Joseph Solfanelli, acting on behalf of Gleneagles Investment, bid and acquired Raymond's lands for $535,290.39. These transactions did not stand up. At trial, the parties stipulated that both county tax sales were invalid and that Raymond's lands purportedly sold to Tabor Court and Gleneagles remained assets owned by Raymond.
 
 
 28
 On January 26, 1977, the sale and assignment of the IIT mortgages took place. Pagnotti paid approximately $4.5 million for the IIT mortgages; at that time, the mortgage balance was $5,817,475.69. Pagnotti thereafter assigned the mortgage to McClellan, thus making McClellan a key figure in this litigation. On December 12, 1977, Hyman Green, one of Durkin's co-shareholders in Raymond, was told that McClellan intended to sell, at a private sale, many of Raymond's assets encumbered as collateral on the IIT mortgages. McClellan did just that--it foreclosed. On February 28, 1978, in a private sale, Loree Associates purchased the assets fromn McClellan for $50,000. This sale was not advertised nor were the assets offered to any other parties. Additionally, the sale was not recorded on the books of either Loree Associates or McClellan until May 1983, six months after the start of the litigation below. Nor was this the only private sale. On October 6, 1978, McClellan foreclosed on the stock of Raymond and sold it at a private sale for $1 to Joseph Solfanelli, as trustee for Pagnotti. Again, the sale was not advertised nor was anyone other than Green informed of the sale. No appraisals were obtained for either the stock or the collateral purportedly sold by McClellan at these sales.
 
 
 29
 This, then, constitutes a summary of the adjudicative facts that undergird the litigation below and the appeals before us.
 
 II.
 
 30
 The instant action was commenced by the United States on December 12, 1980 to reduce to judgment certain corporate federal tax assessments made against the Raymond Group and Great American. The government sought to assert the priority of its tax liens and to foreclose against the property that Raymond had owned at the time of the assessments as well as against properties currently owned by Raymond. The United States argued that the IIT mortgages executed in November 1973 should be set aside under the Uniform Fraudulent Conveyance Act and further that the purported assignment of these mortgages to Pagnotti should be voided because at the inception Pagnotti had purchased the mortgages with knowledge that they had been fraudulently conveyed.
 
 
 31
 As heretofore stated, after a bench trial, the district court issued three separate published opinions. In Gleneagles I, 565 F.Supp. 556 (1983), the court concluded, inter alia, that the mortgages given by the Raymond Group to IIT on November 26, 1973 were fraudulent conveyances within the meaning of the constructive and intentional fraud sections of the Pennsylvania Uniform Fraudulent Conveyances Act, 39 Pa.Stat. Secs. 354-357. In Gleneagles II, 571 F.Supp. 935 (1983), the court further held that the mortgages to McClellan Realty were void as against the other Raymond Group creditors. In its third opinion, 584 F.Supp. 671 (1984), the court set out the priority of the creditors. The court granted McClellan and Tabor Court an equitable lien ahead of the creditors for the Pennsylvania municipal taxes they paid in Raymond's behalf prior to the 1976 Lackawanna county tax sale of Raymond's properties. However, the court placed McClellan, as assignee of the IIT mortgages, near the bottom of the list of creditors. The trustee in bankruptcy of Blue Coal and Glen Nan argues that McClellan's rights are totally invalidated and that McClellan has no standing whatsoever as a creditor.
 
 
 32
 The Raymond Group--four coal mining companies that executed the mortgages (Raymond Colliery, Blue Coal, Glen Nan, and Olyphant Associates) as well as interrelated associated companies that had placed guarantee mortgages and subsidiaries of such associated companies--has appealed. As heretofore stated, all these mortgages, subsequently invalidated by the district court, had been granted to IIT on November 26, 1973 and assigned by IIT to appellant McClellan. For the purpose of this appeal, we shall refer to the Raymond Group as "appellants", or "McClellan".
 
 
 33
 Jurisdiction was proper in the trial court, 28 U.S.C. Secs. 1340, 1345. We are satisfied that jurisdiction on appeal is proper based on 28 U.S.C. Sec. 1291. Although one or two parties have questioned the timeliness of McClellan's appeal based on a contention that partially defective service of McClellan's motion for a new district court trial failed to toll the running of the 60-day period for filing appeals under Rule 4(a)(1) of the Federal Rules of Appellate Procedure, we are satisfied that this was not fatal. See Thompson v. INS, 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (1964).
 
 III.
 
 34
 McClellan initially challenges the district court's application of the Pennsylvania Uniform Fraudulent Conveyances Act (UFCA), 39 Pa.Stat. Secs. 351-363, to the leveraged buy-out loan made by IIT to the mortgagors, and to the acquisition of the mortgages from IIT by McClellan. The district court determined that IIT lacked good faith in the transaction because it knew, or should have known, that the money it lent the mortgagors was used, in part, to finance the purchase of stock from the mortgagors' shareholders, and that as a consequence of the loan, IIT and its assignees obtained a secured position in the mortgagors' property to the detriment of creditors. Because this issue involves the interpretation and application of legal precepts, review is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir.1981).
 
 
 35
 In applying section 353(a) of the UFCA, the district court stated:
 
 
 36
 The initial question ... is whether the transferee, IIT, transferred its loan proceeds in good faith.... IIT knew or strongly suspected that the imposition of the loan obligations secured by the mortgages and guarantee mortgages would probably render insolvent both the Raymond Group and each individual member thereof. In addition, IIT was fully aware that no individual member of the Raymond Group would receive fair consideration within the meaning of the Act in exchange for the loan obligations to IIT. Thus, we conclude that IIT does not meet the standard of good faith under Section 353(a) of the Act. See e.g., Cohen v. Sutherland, 257 F.2d at 742 [ (2d Cir.1958) ] (transferee's knowledge that the transferor is insolvent defeats assertion of good faith); Epstein v. Goldstein, 107 F.2d 755, 757 (2d Cir.1939) (transferee's knowledge that no consideration was received by transferor relevant to the issue of good faith).
 
 
 37
 565 F.Supp. at 574.
 
 
 38
 McClellan argues that "the only reasonable and proper application of the good faith criteria as it applies to the lender in structuring a loan is one which looks to the lender's motives as opposed to his knowledge." Br. for appellants at 17. McClellan argues that good faith is satisfied when "the lender acted in an arms-length transaction without ulterior motive or collusion with the debtor to the detriment of creditors." Id.
 
 
 39
 Section 354 of the UFCA is a "constructive fraud" provision. It establishes that a conveyance made by a person "who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made ... without a fair consideration." 39 Pa.Stat. Sec. 354. Section 353 defines fair consideration as an exchange of a "fair equivalent ... in good faith." 39 Pa.Stat. Sec. 353. Because section 354 excludes an examination of intent, it follows that "good faith" must be something other than intent; because section 354 also focuses on insolvency, knowledge of insolvency is a rational interpretation of the statutory language of lack of "good faith." McClellan would have us adopt "without ulterior motive or collusion with the debtor to the detriment of creditors" as the good faith standard. We are uneasy with such a standard because these words come very close to describing intent.
 
 
 40
 Surprisingly, few courts have considered this issue. In Epstein v. Goldstein, 107 F.2d 755, 757 (2d Cir.1939), the court held that because a transferee had no knowledge of the transferor's insolvency, it could not justify a finding of bad faith, implying that a showing of such knowledge would support a finding of bad faith. In Sparkman and McClean Co. v. Derber, 4 Wash.App. 341, 481 P.2d 585 (1971), the court considered a mortgage given to an attorney by a corporation on the verge of bankruptcy to secure payment for his services. The trial court found that the transaction had violated section 3 of the UFCA (here, section 353) because it had been made in bad faith. On appeal the Washington Court of Appeals stated that "prior cases ... have not precisely differentiated the good faith requirement ... of fair consideration [in UFCA section 3] from the actual intent to defraud requirement of [UFCA section 7]." Id. at 346, 481 P.2d at 589. The court then set forth a number of factors to be considered in determining good faith: 1) honest belief in the propriety of the activities in question; 2) no intent to take unconscionable advantage of others; and 3) no intent to, or knowledge of the fact that the activities in question will, hinder, delay, or defraud others. Id. at 348, 481 P.2d at 591. Where "any one of these factors is absent, lack of good faith is established and the conveyance fails." Id. See also Wells Fargo Bank v. Desert View Bldg. Supplies, Inc., 475 F.Supp. 693, 696-97 (D.Nev.1978) (lender lacked good faith when exchanging its securities for preexisting loans in context of an impending bankruptcy), aff'd mem., 633 F.2d 225 (9th Cir.1980).
 
 
 41
 We have decided that the district court reached the right conclusion here for the right reasons. It determined that IIT did not act in good faith because it was aware, first, that the exchange would render Raymond insolvent, and second, that no member of the Raymond Group would receive fair consideration. We believe that this determination is consistent with the statute and case law.
 
 
 42
 McClellan and amicus curiae also argue that as a general rule the UFCA should not be applied to leveraged buy-outs. They contend that the UFCA, which was passed in 1924, was never meant to apply to a complicated transaction such as a leveraged buy-out. The Act's broad language, however, extends to any "conveyance" which is defined as "every payment of money ... and also the creation of any lien or incumbrance." 39 Pa.Stat. Sec. 351. This broad sweep does not justify exclusion of a particular transaction such as a leveraged buy-out simply because it is innovative or complicated. If the UFCA is not to be applied to leveraged buy-outs, it should be for the state legislatures, not the courts, to decide.
 
 
 43
 In addition, although appellants' and amicus curiae's arguments against general application of the Act to leveraged buy-outs are not without some force, the application of fraudulent conveyance law to certain leveraged buy-outs is not clearly bad public policy.[2] In any event, the circumstances of this case justify application. Even the policy arguments offered against the application of fraudulent conveyance law to leveraged buy-outs assume facts that are not present in this case. For example, in their analysis of fraudulent conveyance law, Professors Baird and Jackson assert that their analysis should be applied to leveraged buy-outs only where aspects of the transaction are not hidden from creditors and the transaction does not possess other suspicious attributes. See Baird and Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand.L.Rev. 829, 843 (1985). In fact, Baird and Jackson conclude their article by noting that their analysis is limited to transactions in which "the transferee parted with value when he entered into the transaction and that transaction was entered in the ordinary course." Id. at 855 (footnote omitted). In the instant case, however, the severe economic circumstances in which the Raymond Group found itself, the obligation, without benefit, incurred by the Raymond Group, and the small number of shareholders benefited by the transaction suggest that the transaction was not entered in the ordinary course, that fair consideration was not exchanged, and that the transaction was anything but unsuspicious. The policy arguments set forth in opposition to the application of fraudulent conveyance law to leveraged buy-outs do not justify the exemption of transactions such as this.[3]
 
 IV.
 
 44
 McClellan next argues that under section 359(2) of the UFCA, it is entitled to a lien superior to all other creditors on Raymond's property. Br. for appellants at 27. Once again, review of this issue is plenary. Universal Minerals, 669 F.2d at 102.
 
 A.
 
 45
 Section 359 establishes a two-tier system to protect certain purchasers from the effects of the UFCA. Section 359(1) permits a purchaser who has paid "fair consideration without knowledge of the fraud at the time of the purchase" to maintain the conveyance as valid against a creditor. 39 Pa.Stat. Sec. 359(1). Section 359(2) of the Act specifies that a "purchaser who, without actual fraudulent intent, has given less than a fair consideration for the conveyance or obligation may retain the property or obligation as security for repayment." 39 Pa.Stat. Sec. 359(2).
 
 
 46
 In Gleneagles II, the district court found that Pagnotti, who purchased the IIT mortgages for $4,047,786 and transferred them to McClellan Realty, was not entitled to protection under section 359(1). The court determined that although Pagnotti had given a "fair equivalent" for the IIT mortgages, it did not do so without knowledge of the fraud at the time of the purchase. 571 F.Supp. at 952.
 
 
 47
 In Gleneagles III, the district court concluded that McClellan, Pagnotti's assignee, was not entitled to the partial protection of section 359(2). The court stated that although it had found in Gleneagles II that Pagnotti had not acted in good faith in acquiring the IIT mortgages, this was not equivalent to a finding that Pagnotti had given "less than fair consideration." 584 F.Supp. at 682. The court, however, also implied that notwithstanding its finding that Pagnotti had not acted with "actual fraudulent intent," it had not "purchased the IIT mortgages in good faith." Id. The court ruled that good faith is at least required to merit protection under section 359(2). The court therefore found that Pagnotti was not entitled to such protection. Id.
 
 
 48
 McClellan faults this reasoning with an argument that, at least facially, seems persuasive. It argues that the district court's finding that Pagnotti acted with knowledge of the fraud means that Pagnotti acted without good faith and therefore paid "less than fair consideration" as defined by section 353 of the Act. Therefore, McClellan reasons, absent a finding of "actual fraudulent intent," it is entitled to protection under section 359(2).
 
 
 49
 Admittedly, section 359(2) is inartfully drafted and a literal reading of the section could conceivably command this result. We believe, however, that the public policy behind the UFCA compels a different interpretation. The Act protects both purchasers and third parties. We see a distinction here. The Act protects those purchasers, who, without actual fraudulent intent and without a lack of good faith, have paid less than a fair equivalent for the property received. Conversely, the Act does not protect purchases having a fraudulent intent or a lack of good faith. We are not satisfied that the UFCA affords third parties greater protection than purchasers. The purposes of the Act would be nullified if third parties who in bad faith paid less than a fair equivalent could take the property in a better position than an original purchaser who at the outset had engaged in a fraudulent transfer. See e.g., Dealers Discount Corp. v. Vantar Properties, Inc., 45 Misc.2d 49, 50, 256 N.Y.S.2d 257, 259 (1964).
 
 
 50
 We are most uneasy with an interpretation that would deny rights to the purchaser, Pagnotti, but confer them on its assignee, McClellan. Such a literal reading of the statute's language would require us to ignore the statute's purpose. We are reminded of Judge Roger J. Traynor's advice, "We need literate, not literal judges."
 
 B.
 
 51
 Moreover, we find support in analogizing to the federal bankruptcy laws. Section 548(c) of the Bankruptcy Code--the successor to section 67(d)(6) of the Bankruptcy Act--provides that a transferee or obligee of a fraudulent transfer or obligation who takes for value and in good faith may retain the interest transferred or the obligation incurred. 11 U.S.C. Sec. 548(c).[4] This section of the Bankruptcy Code thus closely tracks section 359(2) of the UFCA. Indeed, bankruptcy's leading commentator explains that: "The major similarity between the Bankruptcy Code and the UFCA is reflected in the portion of subsection [548(c) ] that permits the good faith transferee or obligee to retain his lien." 4 Collier on Bankruptcy p 548.07, at 548-65 (15th ed. 1986). McClellan acknowledges that "[t]he fraudulent conveyance provisions of the Code are modeled on the UFCA, and uniform interpretation of the two statutes [is] essential to promote commerce nationally. Cohen v. Sutherland, 257 F.2d 737, 741 (2d Cir.1958)...." Br. for appellants at 29.
 
 
 52
 In two cases similar to the one at bar, courts have denied protection to lenders under section 67(d) of the Bankruptcy Act because, although their conduct was not intentionally fraudulent, the lenders exhibited a lack of good faith. In re Allied Development Corp., 435 F.2d 372, 376 (7th Cir.1970); In re Venie, 80 F.Supp. 250, 256 (W.D.Mo.1948). The same principles should apply here to deny protection to Pagnotti where the record supports the district court's findings that Pagnotti lacked good faith. See The Uniform Fraudulent Conveyance Act in Pennsylvania, 5 U.Pitt.L.Rev. 161, 186 (1939) (Section 359(2) language "without actual fraudulent intent" should mean without knowledge).
 
 C.
 
 53
 McClellan next challenges the district court's finding that as Pagnotti's assignee, it too, lacked good faith, and therefore was disqualified from protection under the Act. McClellan states that "[t]he District Court never suggests, much less finds, that McClellan's dealings with IIT concerning its purchase of the mortgages were anything but at arms-length." Br. for appellants at 25. The district court's determination that McClellan lacked good faith is a factual finding reviewed on the clearly erroneous standard. Krasnov v. Dinan, 465 F.2d 1298, 1299-1300 (3d Cir.1972).
 
 
 54
 Although McClellan attempts to distance itself from Pagnotti, the party that purchased the mortgages from IIT and assigned them to McClellan, it cannot do this successfully. A well-recognized rule provides that an assignee gets only those rights held by its assignor and no more. The district court clearly held that Pagnotti did not obtain the mortgages in good faith. Gleneagles II, 571 F.Supp. at 952. The court supported its findings with facts from the record. See id. at 952-56. Because McClellan's rights as an assignee are no greater than Pagnotti's and because McClellan does not show how the district court's finding of Pagnotti's lack of good faith was clearly erroneous, McClellan is charged with the same quality of faith.[5]
 
 D.
 
 55
 McClellan also presents two arguments that relate to the amount of recovery by the creditors. It argues first that it is entitled to credit for $6.1 million that Raymond shareholders Gillen and Cleveland paid to the creditors and the Commonwealth in settlement of prior actions against those shareholders. The district court found that:The Creditors have claimed in this litigation that the Gillen and Cleveland Defendants are liable for sales of Raymond Group assets made after November 26, 1973 to satisfy the Raymond Group's debt to IIT and others. There is no basis for this Court to apply the $6,100,000 paid by the Gillens and Clevelands to particular injuries suffered by the Creditors as the result of the fraudulent conveyances. Moreover, the settlement agreements provided that the monies paid were also in settlement of other lawsuits by the Creditors and the Commonwealth against the Gillens and Clevelands. There is no basis on the present record for a conclusion by this Court that the $6,100,000 paid by the Gillens and Clevelands pursuant to the settlement agreements was intended solely to compensate the Creditors and the Commonwealth for damages flowing from the Gillens' and Clevelands' acceptance of the IIT loan proceeds on November 26, 1973.
 
 
 56
 Gleneagles III, 584 F.Supp. at 682.
 
 
 57
 We agree. The settlement agreement terms are very specific. The United States agreed to release the "Cleveland Group" from all claims. The agreement defined the Cleveland Group as: "Robert W. Cleveland & Sons, Inc., William T. Kirchoff, Jay W. Cleveland and the Estate of Royal E. Cleveland, as well as any members of either the Robert W. or Royal E. Cleveland families against whom claims by the creditors might be asserted." App. at 480. None of these individuals or entities are currently parties to this action. Any effort by the remaining defendants to come within, or to benefit from, the settlement agreement is clearly not justified by the terms thereof. See app. at 479-84.
 
 E.
 
 58
 McClellan next contends that the district court erred in not crediting McClellan for that portion of the IIT loan that was not passed through to Raymond's shareholders: although "the District Court acknowledged that $2,915,000, or approximately 42 percent, of the IIT loan proceeds originally went for the benefit of ... creditors, IIT and McClellan received no credit therefor in regard to the partial validity of their liens." Br. for appellants at 28. McClellan argues the district court determined that "[t]he wrong committed upon the creditors ... [was] the diversion of some 58 percent of the loan proceeds from the IIT loan to [Raymond's] shareholders." Id. at 29. It concludes that to invalidate the entire mortgage would be to provide Raymond's creditors with a "double recovery." Id. at 28. We understand the dissent to agree with McClellan's analysis when noting that " 'creditors have causes of action in fraudulent conveyance law only to the extent they have been damaged.' " Dissenting typescript at 1307 (citations omitted).
 
 
 59
 McClellan and, by implication, the dissent mischaracterize the district court's findings and conclusions regarding the fraudulent nature of the IIT loans. The district court did not determine that the loan transaction was only partially--or, to use McClellan's formulation, 58%--fraudulent. Nor did the district court conclude that Raymond's creditors had been wronged by only a portion of the transaction. Instead, the district court stated that:
 
 
 60
 McClellan Realty's argument rests on the incorrect assumption that some portions of the IIT mortgages are valid as against the Creditors. In Gleneagles I, 565 F.Supp. at 580, 586, this Court found that IIT and Durkin engaged in an intentionally fraudulent transaction on November 26, 1973. The IIT mortgages are therefore invalid in their entirety as to creditors.
 
 
 61
 Gleneagles III, 584 F.Supp. at 683. In essence, the district court ruled that the aggregate transaction was fraudulent, notwithstanding the fact that a portion of the loan proceeds was allegedly used to pay existing creditors.
 
 
 62
 This determination is bolstered by the fact that most of the $2,915,000 allegedly paid to the benefit of Raymond's creditors went to only one creditor--Chemical Bank. In Gleneagles I, the district court found that $2,186,247 of the IIT loan proceeds were paid to Chemical Bank in satisfaction of the mortgage that Raymond had taken to purchase Blue Coal (a Raymond subsidiary). See 565 F.Supp. at 570, 571 (findings 132(k) and 140). The purpose of this payment is of critical significance:
 
 
 63
 The Gillens and the Clevelands [Raymond's shareholders] required satisfaction of the Chemical Bank mortgage as a condition of the sale of their Raymond Colliery stock at least in part because Royal Cleveland had personally guaranteed repayment of that loan.
 
 
 64
 Id. at 571 (finding 141). McClellan does not challenge this finding on appeal. Thus, of the $2.9 million allegedly paid to benefit Raymond's creditors, $2.2 million were actually intended to benefit Raymond's shareholders and to satisfy a condition for the sale. The remaining amounts allegedly paid to benefit Raymond's creditors were applied to the closing costs of the transaction. See id. at 570 (finding 133).
 
 
 65
 On this record, the district court's characterization of the transaction as a whole as fraudulent cannot reasonably be disputed. The court's consequent determination that the "IIT mortgages are ... invalid in their entirety as to creditors" is supported by precedent. See Newman v. First National Bank, 76 F.2d 347, 350-51 (3d Cir.1935).[6]
 
 
 66
 Moreover, as the district court correctly noted, it sits in equity when fashioning relief under the UFCA. Gleneagles III, 584 F.Supp. at 682. Consequently, our review of the district court's action is severely limited. Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.1977), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 306 (1977).
 
 
 67
 The district court determined that "[t]he Creditors ... would not be placed in the same or similar position which they held with respect to the Raymond Group in 1973 merely by replacing the $4,085,500 of IIT loan proceeds that were misused on November 26, 1973." Gleneagles III, 584 F.Supp. at 681. We agree with the district court and are persuaded that this court's decision in Newman controls. In Newman we held that where a creditor was prevented from recovering on its judgment as a result of a fraudulent scheme between the debtor and another creditor, a judgment obtained by the defrauding creditor was totally void. We stated that "[i]f we extract from the fraudulent actors every advantage which they derived from their fraud and restore the creditor to the position which lawfully belonged to it at the time the fraud was perpetrated and give it all rights which, but for the fraud, it had under the law, we feel that equity would adequately be done." Id. at 350. Here, the district court found that only by voiding the entire amount could the creditors be placed in the same position they held before the November 26, 1973 misuse of the loans. To the extent that this determination was based on facts, we do not view them as clearly erroneous; to the extent the conclusion was based on law, we find no error. Consequently, we do not believe that the district court's equitable remedy was "arbitrary, fanciful, or unreasonable," or the product of "improper standards, criteria, or procedures." Evans, 555 F.2d at 378.
 
 
 68
 For the above reasons, therefore, we will not disturb the district court's determination that McClellan is not entitled to a "lien superior to all other creditors" as the assignee of all or part of the IIT mortgages.[7]V.
 
 
 69
 McClellan, joined by the amicus, next argues that the district court erred "by collapsing two separate loans into one transaction." Br. for appellants at 30. The loan arrangement was a two-part process: the loan proceeds went from IIT to the borrowing Raymond Group companies, which immediately turned the funds over to Great American, which used the funds for the buy-out. McClellan contends that the district court erred by not passing on the fairness of the transaction between IIT and the Raymond Group mortgagors. Review of this issue is plenary. Universal Minerals, 669 F.2d at 102.
 
 
 70
 Contrary to McClellan's contentions, the district court did examine this element of the transaction, stating: "[W]e find that the obligations incurred by the Raymond Group and its individual members to IIT were not supported by fair consideration. The mortgages and guarantee mortgages to secure these obligations were also not supported by fair consideration." Gleneagles I, 565 F.Supp. at 577 (emphasis supplied).
 
 
 71
 Admittedly, in the course of its determination that the IIT-Raymond Group transaction was without fair consideration under section 353(a), the court looked beyond the exchange of funds between IIT and the Raymond Group. But there was reason for this. The two exchanges were part of one integrated transaction. As the court concluded: "[t]he $4,085,000 in IIT loan proceeds which were lent immediately by the borrowing companies to Great American were merely passed through the borrowers to Great American and ultimately to the selling stockholders and cannot be deemed consideration received by the borrowing companies." Id. at 575.
 
 
 72
 The district court's factual findings support its treatment of the IIT-Raymond Group-Great American transaction as a single transaction. For example, Durkin, president of Great American, solicited financing from IIT for the purchase. Id. at 566 (finding 70). The loan negotiations included representatives of all three parties. Id. at 567 (findings 83-87). The first closing was aborted by IIT's counsel because of, inter alia, concern about "unknown individuals" involved with Great American. Id. at 567-68 (finding 89(a)). The $7 million loaned by IIT to the borrowing companies was "immediately placed in an escrow account"; "simultaneously" with the receipt of the IIT proceeds, the borrowing companies loaned Great American the cash for the buy-out and received in return "an unsecured note promising to repay the loans to the borrowing companies on the same terms and at the same interest rate as pertained to the loans to the borrowing companies from IIT." Id. at 570 (findings 127-29).
 
 
 73
 Appellant cannot seriously challenge these findings of fact. We are satisfied with the district court's conclusion that the funds "merely passed through the borrowers to Great American." This necessitates our agreement with the district court's conclusion that, for purposes of determining IIT's knowledge of the use of the proceeds under section 353(a), there was one integral transaction.[8]
 
 VI.
 
 74
 McClellan next faults the district court's determination that the Raymond Group was rendered insolvent by "the IIT transaction and the instantaneous payment to the selling stockholders of a substantial portion of the IIT loan in exchange for their stock." Gleneagles I, 565 F.Supp. at 580. McClellan disputes the method of computation used by the district court. The question of insolvency is a mixed question of law and fact. Our review of the legal portions of the issue is plenary, while review of the factual portion is according to the clearly erroneous standard. Universal Minerals, 669 F.2d at 102.
 
 A.
 
 75
 Section 352 of the UFCA defines insolvency as "when the present, fair, salable value of [a person's] assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." 39 Pa.Stat. Sec. 352(1). As heretofore stated, the district court calculated the Raymond Group's existing debts as "at least $20,000,000 on November 26, 1973." Gleneagles I, 565 F.Supp. at 578. The court then compared Raymond's debt to the "present, fair, salable value" of its assets and found the Group insolvent. Id. at 578-80. In doing so, the court relied on Larrimer v. Feeney, where the Pennsylvania Supreme Court stated:
 
 
 76
 A reasonable construction of the ... statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense i.e. a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature. If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature. A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the present salable value of [his] assets [is] less than the amount required to pay existing debts as they mature the debtor is insolvent.
 
 
 77
 411 Pa. 604, 608, 192 A.2d 351, 353 (1963) (emphasis supplied, citation omitted). Guided by this teaching, the court found that: (1) the Raymond Group's coal production, which had been unprofitable since 1969, "could not produce a sufficient cash flow to pay the company's obligations in a timely manner"; (2) the sale of the Raymond Group's surplus lands, which had provided a substantial cash flow, was "abruptly cut off" by the terms of the IIT agreement; and (3) sale of its equipment could not generate adequate cash to meet Raymond's existing debts as they matured. Gleneagles I, 565 F.Supp. at 579-80. These determinations are the factual components of the insolvency finding; McClellan contends that at least one of the findings is clearly erroneous.
 
 B.
 
 78
 McClellan challenges the second of these determinations, arguing that under Montana and New York law, "[p]roper application of Sec. 352(1) requires the valuation of an asset at its present value, provided it can be liquidated within a reasonably immediate period of time--not its value if liquidated immediately." Br. for appellants at 37 (citing Duncan v. Landis, 106 F. 839 (3d Cir.1901); In re Crystal Ice & Fuel Co., 283 F. 1007 (D.Mont.1922); Tumarkin v. Gallay, 127 F.Supp. 94 (S.D.N.Y.1954)). McClellan argues that the court's characterization of "Raymond Group's vast lands, culm banks, and coal reserves [as] ... highly illiquid assets which could not be sold except over an extended period of time," 565 F.Supp. at 579, was clearly erroneous. However, the court did not disregard the potential of these lands. It applied the Larrimer criteria of Pennsylvania, not those of Montana or New York. It held that sale of these lands would have been insufficient to meet Raymond's debts as they matured:
 
 
 79
 [The] cash flow [from land sales] was abruptly cut off by the IIT agreement which provided that, for the land sales which occurred in 1974 and 1975, IIT would receive a total of $1,832,500 of the first $2,500,000 of land sale proceeds received by the Raymond Group. The remaining proceeds of $667,500 would be placed by IIT in a "funded reserve" and would be used to pay the Raymond Group's creditors. However, if the lands were taxed as ordinary income to the Raymond Group, which was exceedingly likely and in fact came to pass, each land sale would result in a cash loss to the Raymond Group as the amount of federal taxes due would exceed the funds allocated to the "funded reserve" from that sale. Moreover, no cash would be available for creditors other than IIT, the Ford Motor Credit Co. and Thrift Credit from the sale of surplus lands. Thus, the cash that could be generated by the operation of the Raymond Group's business was grossly insufficient to meet its obligations.
 
 
 80
 Id. We conclude that McClellan has not demonstrated that this finding was clearly erroneous. We are satisfied that the district court followed the guidance of Pennsylvania courts in analyzing the Raymond Group's insolvency. Its application of the law was not in error, nor were its factual determinations clearly erroneous.
 
 VII.
 
 81
 McClellan next argues that the district court erred in holding that the mortgages were invalid under section 357 of the UFCA, 39 Pa.Stat. Sec. 357. Review of this issue is plenary. Universal Minerals, 669 F.2d at 102.
 
 
 82
 As distinguished from the "constructive fraud" sections of the UFCA discussed supra, section 357 invalidates conveyances made with an intent to defraud creditors: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." 39 Pa.Const.Stat. Sec. 357. Under Pennsylvania law, an intent to hinder, delay, or defraud creditors may be inferred from transfers in which consideration is lacking and where the transferer and transferee have knowledge of the claims of creditors and know that the creditors cannot be paid. Godina v. Oswald, 206 Pa.Super. 51, 55, 211 A.2d 91, 93 (1965). Direct evidence is not necessary to prove "actual intent." Continental Bank v. Marcus, 242 Pa.Super. 371, 377, 363 A.2d 1318, 1321 (1976). In Pennsylvania, the existence of actual intent is a question of fact, Golder v. Bogash, 325 Pa. 449, 452, 188 A. 837, 838 (1937); therefore, the court's determination is reviewed on the clearly erroneous standard. Krasnov v. Dinan, 465 F.2d 1298, 1299-1300 (3d Cir.1972).
 
 A.
 
 83
 The evidence recited by the district court supports its finding of an intent to hinder creditors. McClellan does not challenge the sufficiency of this evidence, but rather its application, arguing that from this evidence the court inferred intent, and that inferences and presumptions are proscribed by section 357. This argument was rejected by the Pennsylvania courts in Godina v. Oswald, 206 Pa.Super. 51, 211 A.2d 91 (1965). There, the court ruled that " '[s]ince fraud is usually denied, it must be inferred from all facts and circumstances surrounding the conveyance, including subsequent conduct.' " Id. at 55, 211 A.2d at 93 (quoting Sheffit v. Koff, 175 Pa.Super. 37, 41, 100 A.2d 393, 395 (1953)). This is precisely what the district court did here. See Gleneagles I, 565 F.Supp. at 580-83.
 
 B.
 
 84
 Appellant also objects to the district court's statement that "[i]f the parties could have foreseen the effect on creditors resulting from the assumption of the IIT obligation by the Raymond Group ... the parties must be deemed to have intended the same." 565 F.Supp. at 581. McClellan argues that the court erred in applying the concept of forseeability, an issue only relevant to negligence. This presents a slightly more troublesome question, because we believe that one of the cases cited by the district court does not support the challenged statement. See Chorost v. Grand Rapids Factory Show Rooms, Inc., 172 F.2d 327, 329 (3d Cir.1949) (actual fraud may be found on the basis of circumstantial evidence notwithstanding willful ignorance of defrauding parties). We do find support, however, in In re Process-Manz Press, Inc., 236 F.Supp. 333 (N.D.Ill.1964), also cited by the district court. That case does not address foreseeability, but relies on the proposition that a party is deemed to have intended the natural consequences of his acts. Id. at 347. We are satisfied that this principle supports the district court's conclusion.[9]
 
 C.
 
 85
 We conclude that the court's finding on intent was not clearly erroneous.
 
 VIII.
 
 86
 Finally, McClellan challenges the district court's invalidation of the guarantee mortgages. The district court invalidated these mortgages because the guarantors did not receive fair consideration. 565 F.Supp. at 577.
 
 
 87
 McClellan, relying on Telefest, Inc. v. VU-TV, Inc., 591 F.Supp. 1368 (D.N.J.1984), argues that the guarantors were so closely associated with the borrower companies that they received sufficient indirect consideration from the benefits to the borrowing companies. In Telefest, however, the existence of fair consideration was undisputed. See id. at 1370. The court held that the cross-collateral guarantor company also benefitted from the fair consideration provided to the borrowers. Id. at 1378-79. The consideration in the underlying transaction here, however, was determined to be deficient. Any indirect benefit to guarantor companies deriving from that consideration would, a fortiori, also be deficient. The district court did not err in so holding.
 
 IX.
 
 88
 We now turn to the cross appeals.
 
 A.
 
 89
 The government argues that the district court erred in finding that Pagnotti, who had paid real estate taxes prior to the Lackawanna and Luzerne County tax sales, is entitled to an equitable lien for the municipal taxes that it paid. During the litigation the parties stipulated that the purported county tax sales were invalid, and that ownership based on the tax sales was invalid. The district court reasoned that:
 
 
 90
 Raymond Colliery's Commonwealth and pre-1974 real estate taxes were first liens on the lands of Raymond Colliery and were paid by L. Robert Lieb when the Pagnotti Defendants were neither owners of the land nor owners of the IIT mortgages. Because of this Court's conclusion in Gleneagles II that the 1976 tax sale was invalid, the 1976 Tabor Court bid on the lands of Raymond Colliery was tantamount to a payment of Raymond Colliery's real estate taxes and likewise was also a payment made before the Pagnotti Defendants owned the lands of Raymond Colliery or the IIT mortgages. These tax payments discharged liens on the lands of Raymond Colliery which were ahead of those claimed by the United States. Equitably, the Pagnotti Defendants should now receive a lien position reflecting these tax payments ahead of the lien position accorded the United States. Likewise, because the above tax payments by the Pagnotti Defendants discharged liens ahead of the liens claimed in this litigation by the various counties and other municipalities, the Pagnotti Defendants should receive liens reflecting the tax payments ahead of those lienors.
 
 
 91
 ... [T]he April 1977 payment to the City of Scranton should be treated in the same manner as the 1976 tax sale bid.
 
 
 92
 Gleneagles III, 584 F.Supp. at 685.
 
 
 93
 When fashioning equitable relief, such as here, a court acts with broad discretion. Lacks v. Fahmi, 623 F.2d 254, 256 (2d Cir.1980). We therefore review the district court's decision to grant an equitable lien for abuse of discretion, which "exists only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.1977), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).
 
 
 94
 In Newman v. First National Bank, 76 F.2d 347 (3d Cir.1935), we held that even a grantee guilty of intentional fraud was entitled to be paid, prior to other creditors, from the sale proceeds of the subject property for the amount of taxes the grantee had paid as owner of the subject property. Id. at 351. The district court found that the taxes for which payments were made, both prior to and at the 1976 tax sale, constituted prior liens for taxes or the upset price (past due taxes) owing against the parcels of land which were the subject of the 1976 tax sale. Gleneagles II, 571 F.Supp. at 947-49 (findings 166, 188, 190). These findings are not challenged. Based on Newman, the district court did not act in an "arbitrary, fanciful, or unreasonable" manner in granting McClellan an equitable lien for the taxes it paid on Raymond property, prior to the liens of other creditors.
 
 B.
 
 95
 The United States and cross-appellant trustee in bankruptcy for two major Raymond Group companies, Blue Coal Corporation and Glen Nan, complain that the court erred by awarding McClellan a place on the creditors' list as assignee of the IIT mortgages, albeit number 16 in a list of 17 liens. The court determined that this priority lien reflected $17,319,326.58, the amount claimed by McClellan to be due on the direct mortgages assigned by IIT to it, including principal and interest. Gleneagles III, 584 F.Supp. at 688. See also id. at 678 (finding 462). Cross appellants argue that under section 9-504 of the Pennsylvania Uniform Commercial Code, the IIT mortgages should be invalidated in their entirety and that McClellan is entitled to no recognition in the order of liens. Review of this issue is plenary. Universal Minerals, Inc., 669 F.2d at 102.
 
 
 96
 The Uniform Commercial Code confers upon a secured party the right, upon default, to dispose of collateral by sale or lease, subject to the requirement that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." 13 Pa.Con.Stat. Sec. 9504. When a private sale of repossessed collateral has been made, and the debtor raises the question of the commercial reasonableness of that sale, the great weight of authority holds that the burden of proof is shifted to the secured party seeking a deficiency judgment to show that, under the totality of circumstances, the disposition of collateral was commercially reasonable. United States v. Willis, 593 F.2d 247, 258 (6th Cir.1979); see cases collected in 59 A.L.R.3d, 378-80 (1974) (reasonableneness of disposition of collateral); 69 Am.Jur.2d Secured Transactions Sec. 623, pp. 530-31 (1973). Here the district court found that the McClellan's foreclosure sales of Raymond's assets were commercially unreasonable. Gleneagles III, 584 F.Supp. at 690 (conclusion 37).
 
 
 97
 When there has been a commercially unreasonable disposition of collateral, the effect of that disposition upon a creditor's entitlement to recovery of remaining debt must be considered. Pennsylvania courts have held that "failure to establish commercial reasonableness of the resale price creates a presumption that the value of the collateral equalled the indebtedness secured, thereby extinguishing the indebtedness unless the secured party rebuts the presumption." Savoy v. Beneficial Consumer Discount Co., 503 Pa. 74, 78, 468 A.2d 465, 467 (1983).
 
 
 98
 Cross appellants argue, and McClellan does not dispute, that McClellan failed to produce any evidence regarding the value of the property sold in its foreclosure sales of Raymond's assets to rebut the Savoy presumption. It will be remembered that at a private sale McClellan sold certain Raymond assets to Loree Associates for $50,000, and all of the Raymond's stock to Joseph Solfanelli, as trustee for Pagnotti, for $1. Gleneagles III, 584 F.Supp. at 676 (findings 429-30). McClellan responds that the UCC is not intended to have a punitive effect and that consequently "[t]he rebuttable presumption rule is inapplicable here for it is not appropriate or fair to impose such a drastic, punitive measure upon McClellan." Reply Br. for appellants at 24.
 
 
 99
 We nevertheless believe that Savoy controls. There the creditor had failed to rebut the presumption, absent evidence of the value of the collateral, that the value of the collateral sold equals the indebtedness. The Savoy trial court took judicial notice of the market value of the collateral, but on appeal the Pennsylvania Supreme Court adopted a strict interpretation of the statute and invalidated the creditor's lien in toto: "[Creditor's] entitlement to a deficiency judgment has been extinguished by its failure to rebut the presumption as to the value of the collateral." 503 Pa. at 79-80, 468 A.2d at 468. Because the district court found McClellan's sale of the Raymond collateral commercially unreasonable, Savoy requires that we reverse the district court's decision in Gleneagles III to the extent that it recognizes McClellan's status as a creditor as against the trustee in bankruptcy. To the extent that the district court recognized a mortgage lien, see 584 F.Supp. at 688, as distinguished from an equitable lien representing county tax payment, the district court erred in failing to invalidate the mortgage lien completely.
 
 X.
 
 100
 We have carefully considered all the contentions of appellants and cross appellants. The judgment of the district court will be affirmed in all respects, except we will vacate that portion of p 4 of the final order and judgment, app. at 173, relating to the McClellan mortgage lien set forth as Number 16 in priority, see 584 F.Supp. at 688, and remand these proceedings with a direction that an order be entered declaring void the assigned IIT mortgages and other security instruments of McClellan as against the trustee in bankruptcy and further declaring that as to the trustee, McClellan possesses no rights as a creditor with respect to the putative assignment of the IIT mortgages.
 
 
 101
 A. LEON HIGGINBOTHAM, JR., Circuit Judge, concurring in part and dissenting in part.
 
 
 102
 I concur in the majority's judgment that Pennsylvania's fraudulent conveyance laws may be applied to a leveraged buyout where, as here, a few shareholders seek to use it as a device to benefit themselves and take advantage of the creditors of a clearly faltering corporation. Since I find that the purposes underlying Pennsylvania's fraudulent conveyance law dictate that only a portion of the disputed transfer of funds be set aside, however, I must dissent from that part of the majority's opinion which declares the IIT mortgage loans wholly void.
 
 
 103
 The basic objective of fraudulent conveyance law is to preserve estates and to prevent them from being wrongfully drained of assets. See Melamed v. Lake County National Bank, 727 F.2d 1399, 1401 (6th Cir.1984). Fraudulent conveyance law is not intended to add to estates for the unjustified benefit of creditors. In fact, "creditors have causes of action in fraudulent conveyance law only to the extent they have been damaged." A/S Kreditt-Finans v. Cia Venetico De Navegacion, 560 F.Supp. 705, 711 (E.D.Pa.1983), aff'd, 729 F.2d 1446 (3d Cir.1984). IIT made four separate loans totaling $8,530,000. Of this, $4,085,000 was passed through Raymond Group companies to shareholders and $1,530,000 was retained by IIT as an interest reserve as part of the invalid transaction. However, $2,915,000 was used to pay existing debts (including an existing mortgage loan owned by Chemical Bank). To the extent that the IIT funds were used to pay existing creditors, the assets available to creditors generally were not diminished and the Raymond Group's estate was not improperly depleted.[1] I would therefore hold that only the transfer of the $4,085,000 between IIT and the Raymond Group's shareholders and the creation of the $1,530,000 interest reserve for IIT should be set aside.
 
 
 
 [1]
 Durkin owned 40% of Great American. Hyman Green owned 10%, and James R. Hoffa, Jr. owned the remaining 50%. Durkin and Green concealed Hoffa's ownership interest in Great American from IIT. Hoffa apparently came into the picture when Durkin attempted to borrow money from the Central States Pension Fund of the International Brotherhood of Teamsters to finance the purchase
 
 
 [2]
 A major premise of the policy arguments opposing application of fraudulent conveyance law to leveraged buy-outs is that such transactions often benefit creditors and that the application of fraudulent conveyance law to buy-outs will deter them in the future. See Baird and Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand.L.Rev. 829, 855 (1985). An equally important premise is that creditors can protect themselves from undesirable leveraged buy-outs by altering the terms of their credit contracts. Id. at 835. This second premise ignores, however, cases such as this one in which the major creditors (in this instance the United States and certain Pennsylvania municipalities) are involuntary and do not become creditors by virtue of a contract. The second premise also ignores the possibility that the creditors attacking the leveraged buy-out (such as many of the creditors in this case) became creditors before leveraged buy-outs became a common financing technique and thus may not have anticipated such leveraged transactions so as to have been able to adequately protect themselves by contract. These possibilities suggest that Baird and Jackson's broad proscription against application of fraudulent conveyance law to leveraged buy-outs may not be unambiguously correct
 
 
 [3]
 It should also be noted that another basic premise of the Baird and Jackson analysis is that as a general matter fraudulent conveyance law should be applied only to those transactions to which a rational creditor would surely object. Baird and Jackson, at 834. Although a rational creditor might under certain circumstances consent to a risky but potentially beneficial leveraged buy-out of a nearly insolvent debtor, no reasonable creditor would consent to the intentionally fraudulent conveyance the district court correctly found this transaction to be. Thus, the application of fraudulent conveyance law to the instant transaction appears consistent even with Baird and Jackson's analysis
 
 
 [4]
 "Fair consideration" is defined under Section 353 of the Bankruptcy Code as an exchange of fair equivalents in good faith
 
 
 [5]
 McClellan also argues that under section 359(3), no duty was imposed on it, or its assignor, Pagnotti, to make an inquiry into the circumstances of the sale. Section 359(3) provides that:
 (3) Knowledge that a conveyance has been made as a gift or for nominal consideration shall not by itself be deemed to be knowledge that the conveyance was a fraud on any creditor of the grantor, or impose any duty on the person purchasing the property from the grantee to make inquiry as to whether such conveyance was or was not a fraud on any such creditor.
 
 
 [39]
 Pa.Cons.Stat. Sec. 359(3). However, Pagnotti's knowledge went far beyond mere knowledge "that a conveyance has been made as a gift or for nominal consideration." See Gleneagles II, 571 F.Supp. at 952-58
 
 
 [6]
 On broadly analogous facts, the Newman court found that a defendant bank's fraudulent conduct rendered its judgment against a debtor "wholly void":
 Therefore, the whole of it should be set aside. Setting aside only the more vicious part (the $3,500 sham loan) is not enough. It was the act of the Bank in obtaining the judgment by fraud not the amount of the judgment that defeated the [creditor] recovering on its judgment.
 Newman v. First National Bank, 76 F.2d 347, 350-51 (3d Cir.1935) (emphasis added).
 
 
 [7]
 Moreover, even if we were to adopt the analysis of McClellan and the dissent and accept the argument that the IIT mortgages should not be invalidated to the extent that the loan proceeds benefitted Raymond's creditors, we would not conclude that only $4,085,000 of the mortgages should be set aside. McClellan and the dissent apportion the IIT loan proceeds into three categories: $4,085,000 conveyed to Raymond shareholders; $1,530,900 retained by IIT as interest reserve; and $2,915,000 used to pay existing creditors. McClellan and the dissent concede at least for the purposes of argument that $4,085,000 was fraudulently conveyed; they contend that the other amounts benefitted Raymond's creditors. To the extent that the $1,530,000 interest reserve was applied to that portion of the loan that passed to Raymond's shareholders, however, it did not benefit Raymond's creditors. Thus, even under McClellan's and the dissent's analysis, some portion (e.g., 58%) of the IIT mortgages used to fund the $1,530,000 million interest reserve should be invalidated. In addition, McClellan and the dissent ignore the implications of the fact that most of the $2,915,000 allegedly paid to the benefit of Raymond's creditors went to Chemical Bank. See infra, at 1302
 Finally, it must be remembered that IIT recovered over $4.5 million of its loans through repayments from the Raymond Group companies. Gleneagles III, 584 F.Supp. at 683. We agree with the district court that, "even assuming that a valid portion of the IIT mortgages originally existed, that portion was extinguished by the payments on the debt in excess of that portion made by the mortgagors before the assignment of the IIT mortgages." Id.
 
 
 [8]
 Admittedly, McClellan's and amicus' arguments could have some validity where the lender is unaware of the use to which loans proceeds are to be put. That is not the case here. IIT was intimately involved with the formulation of the agreement whereby the proceeds of its loan were funnelled into the hands of the purchasers of the stock of a corporation that was near insolvency. Try as they might to distance themselves from the transaction now, they cannot rewrite history
 
 
 [9]
 Furthermore, even if the error were not harmless, it would not effect the outcome because the court's conclusion that the transfer violated the constructive fraud provision of section 354 was correct. A section 357 violation is cumulative only
 
 
 [1]
 It is clear that Pennsylvania's fraudulent conveyance laws would have permitted the Raymond Group to take out a loan to pay existing debts. Trumbower Co. v. Noe Construction Corp., 64 D. & C.2d 480 (1973). To an extent, this is what the Raymond Group did with IIT loan proceeds